525 F.2d 237
 90 L.R.R.M. (BNA) 2922, 77 Lab.Cas. P 11,125
 LODGES 700, 743, 1746, INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
United Aircraft Corporation, Intervenor.
LOCALS 700, 743, 1746, INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 926, 646, Dockets 74-1035, 74-2211.
 United States Court of Appeals,
Second Circuit.
 Argued June 16, 1975.
Decided Oct. 17, 1975.
 
 Mozart G. Ratner, Washington, D. C. (Plato E. Papps, Washington, D. C., of counsel), for petitioner.
 Marion Griffin, Atty., N.L.R.B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, John D. Burgoyne, Atty., N.L.R.B., Washington, D. C., of counsel), for respondent.
 John A. McGuinn, Washington, D. C. (Joseph C. Wells, Michael J. Bartlett, Guy Farmer, Washington, D. C., of counsel), for intervenor.
 Before GIBBONS,* GURFEIN and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 These petitions question the scope of the policy of the respondent National Labor Relations Board ("Board" or "NLRB") to defer to arbitration cases involving charges of actions which are arguably both violations of the National Labor Relations Act ("NLRA" or "Act") and also susceptible to arbitration as violations of the collective bargaining agreement between the parties.[1] That policy of deferral, announced by the Board in Collyer Insulated Wire, 192 NLRB 837 (1971), is popularly known as the "Collyer" doctrine. The validity of the Collyer doctrine is no longer seriously in doubt. This Court in Nabisco, Inc. v. N.L.R.B., 479 F.2d 770 (2 Cir., 1973) held that such a policy was within the Board's discretion if it felt that deferral in a particular case would further the fundamental aims of the NLRA. The Supreme Court has since added further authority to the policy by quoting favorably from the Board's reasoning in the Collyer decision in William E. Arnold Co. v. Carpenters, 417 U.S. 12, 16-17, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974).
 
 
 2
 Petitioners here, Lodges 700, 743 and 1746, International Association of Machinists and Aerospace Workers, AFL-CIO ("Unions"), argue that we should withdraw our approval of the Collyer doctrine as a general Board policy.[2] We decline to do so. Rather, as we did in the Nabisco case, supra, we have examined this case to determine whether the Board has abused its discretion by deciding that to defer to arbitration furthers the fundamental aims of the NLRA. We find no such abuse of discretion in this case.
 
 
 3
 Our decision rests upon a thorough examination of both the history of the repetitive litigation between the petitioners and the intervenor here, United Aircraft Corporation ("Company"), and the nature of the alleged incidents which gave rise to the petitioners' present charges of unfair labor practices. It will be helpful for us to review here both that history and the factual and procedural backgrounds of the charges filed.
 
 I. Factual and Procedural Background
 A. No. 74-1035
 
 4
 The proceedings in No. 74-1035 before us were initiated before the Board on a series of charges filed by the Unions against the Company from December 1969 through February 1971. The Board's General Counsel issued a complaint in February 1971 and the charges were consolidated for hearing before an administrative law judge. The complaint, after several amendments, charged that the Company had violated Section 8(a)(1)[3] of the Act by harassing union representatives "(u)nder pretext of enforcing plant rules concerning employee conduct on company time and property"; that it had violated Section 8(a)(3) and (1)[4] by imposing, for discriminatory reasons, disciplinary suspensions on two employees; and further that it had violated Section 8(a)(5) and (1)[5] by giving the Unions insufficient notice of layoffs, by refusing to furnish the Unions with standards and other information relevant to grievances with respect to employees' merit ratings, by refusing on certain occasions to provide employees with the services of shop stewards or to discuss employees' grievances with stewards, and by repudiating an agreement with a shop steward to "reconsider and re-rate" an employee's merit rating.
 
 
 5
 In June and July of 1971 a hearing was held before an administrative law judge. He issued his opinion on April 17, 1972. Prior to reciting his findings of fact and conclusions of law with respect to the specific allegations of the complaint, the administrative law judge concluded that this was not an appropriate case for the Board to defer to arbitration pursuant to the Collyer doctrine since "(t)he Company has a history of enmity to union supporters . . . . (citations omitted)" and because "the Company has further infringed upon its employees' statutory rights." 204 NLRB at 884, n. 2.
 
 
 6
 In his findings, the administrative law judge determined that the Company had been guilty of discriminating against and harassing union representatives Gaskins, Havener, Raymond, Lee and Sullivan on several different occasions. More specifically, he found (1) that the Company's strict surveillance of and constant criticism of employees Gaskins and Lee violated § 8(a)(1) of the Act; (2) that the Company's refusal to issue gate passes to employees Gaskins and Lee in order for them to carry union briefcases out of the plant on a daily basis violated § 8(a)(1) of the Act; (3) that the Company's interrogations without the benefit of union representation of employees Raymond and Sullivan concerning incidents of alleged job misconduct violated § 8(a)(1) of the Act; and (4) that the Company's two week suspension of employee Raymond, because of an incident during which both he and his foreman lost their tempers and during which Raymond knocked a pencil out of the foreman's hand, had violated § 8(a) (1) and (3) of the Act. The administrative law judge found no violations of the Act on the Company's part with respect to other incidents involving employees Raymond, Lee and Sullivan.[6] The administrative law judge further found that there was insufficient evidence to find that the Company violated the Act with respect to incidents involving employees Dorsey, Gleason, Williams, Sidusky, Duhamel and Piorek.
 
 
 7
 The administrative law judge also found that the Company had refused to bargain with the Unions, violations of § 8(a)(5) and (1) of the Act, in several instances. In those instances he found (1) that the Company had refused to discuss grievances with eight employees' union representatives; (2) that the Company had violated the collective bargaining agreement by not calling a shop steward for employee Rogers prior to requiring him to sign a disciplinary report;[7] and (3) that the Company had failed to provide employees with Company records, i. e., employee reports prepared by foremen, production inventory control reports, quality review orders, and foremen's notebooks, containing information relevant to those employees' processing of merit rating grievances, at step two of the grievance procedure.[8] He found, however, no Company violations of the Act in the timing of its notification to the Unions of layoffs or its refusal to provide the above-mentioned records to the Unions at step one of the grievance procedure.
 
 
 8
 On July 10, 1973, the Board acted on the administrative law judge's recommendations and filed its decision and order in the case. The Board, with two members dissenting, disagreed with the administrative law judge concerning the applicability of the Collyer doctrine and dismissed the complaint, retaining jurisdiction "solely for the purpose of entertaining an appropriate and timely motion for further consideration on a proper showing that either (a) the dispute has not, with reasonable promptness after the issuance of the Decision here, either been resolved by amicable settlement in the grievance procedure or submitted promptly to arbitration, or (b) the grievance or arbitration procedures have not been fair and regular or have reached a result which is repugnant to the Act" (footnote omitted). 204 NLRB 881. The Board found that there was "positive evidence of the maturation of the collective bargaining relationship" between the parties, based upon the fact that those grievances which had been processed through arbitration had resulted in fair and equitable awards, saying:
 
 
 9
 "Having found that the parties' contractual grievance-arbitration process can, and does, function effectively and fairly and has continued to be utilized by the parties to their satisfaction, '(w)e believe it to be consistent with the fundamental objectives of Federal law to require the parties here to honor their contractual obligations rather than, by casting this dispute in statutory terms, to ignore their agreed-upon procedures.' Collyer Insulated Wire, supra." Id.
 
 B. No. 74-2211
 
 10
 In No. 74-2211 before us, the nature of the Unions' charges against the Company were similar to those in No. 74-1035. The procedural stance of the case before the Board in No. 74-2211, however, was quite different. Relying upon the Board's July 10, 1973 decision in No. 74-1035, the Company, on July 23, 1973, filed a motion for summary judgment before the Board together with a supporting affidavit, showing (1) that with respect to some of the allegations contained in the complaint the parties had arbitrated and were awaiting a decision, (2) that with respect to the remaining allegations, no grievances had previously been filed, and (3) that "(a)ll disputes between the Company, the Union or any employee concerning the interpretation, application or compliance with the parties' collective bargaining agreement and affecting wages, hours or working conditions may be submitted to the parties' contractual grievance procedures, and, if necessary, referred to arbitration by either party or by mutual agreement of the parties . . . ." It further appears that the Company unsuccessfully attempted to convince the Union to submit the remaining disputes to the grievance-arbitration process. In December, 1973, the arbitrator who had heard those complaints which had previously been the subject of grievances issued his opinion dismissing one complaint but finding that the Company had violated the contract by refusing to give the Union certain information and records relevant and necessary for the processing of a merit rating grievance filed by employee Roberge.[9]
 
 
 11
 On September 3, 1974, the Board issued its decision, having by-passed the hearing stage by transferring the case to itself pursuant to its order of August 3, 1973, which order required the parties to show cause why the Company's motion for summary judgment should not be granted. It found that the arbitrator's award had adequately disposed of those allegations of the complaint which had previously been submitted to arbitration, citing Spielberg Manufacturing Company, 112 NLRB 1080 (1955). It further dismissed the complaint, citing Collyer, supra, in a manner identical to that in No. 74-1035.
 
 
 12
 II. Background of the Parties' Prior Litigation
 
 
 13
 The Unions and the Company had enjoyed a relatively peaceful relationship from 1946 until 1960 when a massive strike turned harmony into discord.[10] Since that strike the Unions and the Company have seemingly not hesitated to take their numerous disputes to the Board and the courts.
 
 
 14
 In 1961 the Board first decided, by dismissing the Union's charges, that the Company had not violated the NLRA by prohibiting employees from wearing inflammatory buttons which tended to resurrect the bitterness of the strike. United Aircraft Corp., Pratt & Whitney Div., 134 NLRB 1632 (1961). Shortly thereafter, the parties were again before the Board, United Aircraft Corp., Pratt & Whitney Division, 139 NLRB 39 (1962), where it found that the Company had violated the Act by forbidding distribution of Union solicitation materials in non-working areas of the plant during non-working time. This Court enforced the Board's order. N.L.R.B. v. United Aircraft Corp., Pratt & Whitney Air. Div., 324 F.2d 128 (2 Cir., 1963).
 
 
 15
 The parties again appeared before this Court in Lodge No. 743 v. N.L.R.B., 332 F.2d 784 (2 Cir., 1964). In that case, this Court denied the Union's petition to review the Board's dismissal, in United Aircraft Corp. (Hamilton Standard Div.), 144 NLRB No. 56 (1963), of charges that the Company committed an unfair labor practice by refusing to allow the Union President to be excused during working hours to confer with a Board agent. The Company, in United Aircraft Corp. (Hamilton Standard Div.) v. N.L.R.B., 333 F.2d 819 (2 Cir., 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 796 (1965), came to this Court seeking review of a Board finding, in United Aircraft Corp. (Hamilton Standard Div.), 144 NLRB 492 (1963), that it was an unfair labor practice for the Company to refuse to bargain with a particular group of trainees. This Court enforced the Board's order by dismissing as irrelevant the Company's contention that its refusal to bargain was undertaken with the good faith belief that the trainees were not included in the bargaining unit.
 
 
 16
 In 1967, the Board again found that the Company had engaged in an unfair labor practice. United Aircraft Corporation, 168 NLRB 480 (1967). The Board found that the Company had refused to bargain with the Unions in 1966, and that the refusal to bargain was not based upon a good faith belief that the Unions no longer represented a majority of the members of the bargaining unit. On that occasion, however, the District of Columbia Circuit, in Lodges 1746 & 743, Int. Ass'n. of Mach. & Aero. Wkrs. v. N.L.R.B., 135 U.S.App.D.C. 53, 416 F.2d 809 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752, granted the Company's petition to review and held that the Company did indeed have the privilege of refusing to bargain based upon its good faith doubt of the Union's majority status.
 
 
 17
 In 1969, the Board found further violations of the NLRA by the Company in United Aircraft Corp., 179 NLRB 935 (1969) and United Aircraft Corp., 180 NLRB 278 (1969). These cases involved primarily the suspension or termination of union members, which the Board found to be discrimination and harassment of those employees because of their union affiliation.[11] This Court enforced the Board's order in those cases. United Aircraft Corporation v. N.L.R.B., 440 F.2d 85 (2 Cir., 1971). It is clear from these cases that, at least to some extent in the years 1966 through 1968, the Company had engaged in activities which were unmistakably hostile to the Unions. This Court characterized the Company's behavior as evincing a "general pattern of anti-union activity." Id. at 99.
 
 
 18
 From further events arising in 1968, the parties once again found themselves before the Board. On that occasion, the Board found that the Company's refusal to give the Unions the addresses of all employees within the bargaining unit was a refusal to bargain, a violation of § 8(a)(5) of the NLRA. United Aircraft Corporation, 181 NLRB 892 (1970). Again, this Court enforced the Board's order. United Aircraft Corporation v. N.L.R.B., 434 F.2d 1198 (2 Cir., 1970). In 1971, the Board further found that the Company had violated the NLRA by discriminatorily suspending a union steward when another employee had attempted to deliver a union authorization card to him during working hours. United Aircraft Corporation, 188 NLRB 633 (1971).
 
 
 19
 On July 30, 1971, the Board rendered its final decision with regard to complaints filed by the Union arising from incidents occurring at the time of the 1960 strike. United Aircraft Corp., 192 NLRB 382 (1971). In that decision the Board found violations on the part of the Company during 1960, albeit on a minor scale compared to the massive allegations brought by the Unions.[12]
 
 
 20
 In its most recent decision regarding these parties, United Aircraft Corporation, 199 NLRB 658 (1972), the Board found that the Company had violated the NLRA by unilaterally refusing to grant a promised pay increase to employees who were previously unrepresented but who had chosen one of the locals to represent them just four days prior to the effective date (April 21, 1970) of the promised increase. This Court enforced the Board's order and accepted its conclusions with minor exceptions. N.L.R.B. v. United Aircraft Corp., Hamilton Stand. Div., 490 F.2d 1105 (2 Cir., 1973).[13]
 
 III. Discussion
 
 21
 The petitioners have launched a broadside attack against the Board's findings of fact, its conclusions of law, and its ultimate disposition of these two complaints. Their argument, however, is essentially that since the Company has exhibited a history of enmity toward its employees' exercise of rights protected by the NLRA, the Board has shirked its statutory duty to protect those rights. First they argue that the incidents alleged in the complaints here are so similar to those found in the past by this Court to have evidenced a pattern of anti-union activity that they represent a continuation of that pattern.[14] Amplifying this argument, they claim that the Collyer policy assumes a healthy relationship between the parties, citing National Radio Company, Inc., 198 NLRB No. 1, 80 LRRM 1718, 1724, n. 16 (1972), where the Board singled out the very parties involved here as an example of a case in which its deferral policy might not be appropriate. They attack the Board's conclusion that the violations alleged in the record did not "reflect a pattern of continuation of prior unfair labor practices found against (the Company)" nor demonstrate "anti-union animus such that deferral to arbitration would be a futile gesture."
 
 
 22
 The Board, on the other hand, emphasizes that, notwithstanding that history, there is "positive evidence of maturation of the collective-bargaining relationship," citing specifically the successful processing of the grievances which had previously been filed. We are persuaded that the Board has the stronger position.
 
 
 23
 As mentioned at the outset, this Court has held that the Board has wide discretion to "decline to exercise its authority if to do so will serve the fundamental aims of the (National Labor Relations) Act." Nabisco, Inc. v. N.L.R.B., supra, 479 F.2d at 772; quoting International Harvester Co., Indianapolis Works, 138 NLRB 923, 925-26 (1962); See Carey v. Westinghouse Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), which also quoted favorably from the same passage in International Harvester.[15] Our task is thus to determine whether or not it was an abuse of the Board's discretion to determine that deferral to arbitration here furthered the fundamental aims of the NLRA.
 
 
 24
 It is, of course, well settled that there is strong Congressional policy encouraging arbitration of labor disputes.[16] It has also been said that "the fostering of one policy may be detrimental to another policy, viz.: that expressed by the Congress in granting the Board power to remedy unfair labor practices." Local Union No. 2188, Int. Bro. of Elec. Wkrs. v. N.L.R.B., 161 U.S.App.D.C. 168, 494 F.2d 1087, 1090 (1974). We must remember, however, that both of these policies are merely means toward the end of promoting labor peace.
 
 
 25
 In Local Union No. 2188, the District of Columbia Circuit analyzed the Collyer doctrine in terms of five criteria which could be used to balance the favoring of deferring to arbitration over "remedy(ing) unfair labor practices."[17] Those criteria are the result of an attempt by that Court to list those factors which the Board in Collyer felt to be important in deciding whether or not to exercise its discretion to defer to arbitration. They are not, however, black and white, objective tests which a reviewing court may apply de novo. They involve decisions in which the Board's expertise and its familiarity with the nuances of labor-management problems must be given great weight. That expertise may lead the Board to conclude that in any particular case certain of the criteria should be given more weight than the others. As the Board later stated, "(T)he crucial determinant is, we believe, the reasonableness of the assumption that the arbitration procedure will resolve this dispute in a manner consistent with the standards of Spielberg (112 NLRB 1080 (1955): i. e., that the proceedings have been fair and regular, the parties have agreed to be bound and the results are not clearly repugnant to the Act.)" National Radio Company, Inc., supra, 198 NLRB No. 1, 80 LRRM at 1723 (1972). We agree with that statement. "Arbitration," it should be remembered, "is often a catalyst in labor peace because of its speed." United Steelworkers v. American Internat'l Aluminum Corp., 334 F.2d 147, 153, n. 11 (5 Cir., 1964), cert. denied, 379 U.S. 991, 85 S.Ct. 702, 13 L.Ed.2d 611 (1965). The review of the parties' history serves as only one of the factors used to determine whether or not arbitration can be expected to resolve the charges before the Board.
 
 
 26
 In the instant case the Board conceded that the parties' litigious history demonstrated that their relationship in the past was less than peaceful and that the Company had committed numerous prior unfair labor practices. It found, however, that the present charges did not evidence a continuation of that history of the Company's prior antagonism to union activity. Even if we were to hold that finding to be erroneous, which we are not prepared to do, we still could not say that the Board's decision to defer was necessarily an abuse of discretion in this case. Discrimination against and harassment of union members necessarily indicates "anti-union" activity to a certain extent.[18] An "anti-union" animus would be a controlling factor, however, only if that animus might prevent successful arbitration of the conflicts. Cf. Local Union No. 2188, Int. Bro. of Elec. Wkrs. v. N.L.R.B., supra, 494 F.2d at 1091.
 
 
 27
 Relying upon a showing that the Company was still willing to arbitrate, even after it previously had suffered and complied with adverse awards by arbitrators, the Board was convinced that all of the disputes before it could also be fairly resolved in a like manner. It found that the parties' voluntary machinery for resolving disputes functions "effectively and fairly and has continued to be utilized by the parties to their satisfaction." That determination, which we find to be supported by the record, is sufficient to overcome the Company's "anti-union" history for the Board's deferral purposes.[19]
 
 
 28
 That leaves us with the Unions' argument that the Board should have adopted the arbitrators' findings of fact with respect to violations of the collective bargaining agreements, that it should have used those factual determinations as a basis for finding statutory violations and that it should have fashioned its own appropriate remedy in addition to the arbitration award.[20] We find no merit in that argument. In Spielberg Manufacturing Company, supra, 112 NLRB at 1082, the Board decided that it could, in its discretion, defer to outstanding arbitration awards and fashion no remedy of its own where "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." It later emphasized that its policy is to honor arbitration awards which satisfy the Spielberg criteria, regardless of whether or not it would have made similar awards, or granted similar relief had the matters been before it de novo. Howard Electric Co., 166 NLRB 338, 341, n. 1 (1967); Terminal Transport Company, Inc., 185 NLRB 672, 673 (1970). The courts have approved this policy overwhelmingly. See e. g., Carey v. Westinghouse Corp., supra, 375 U.S. at 270-271, 84 S.Ct. 401; Associated Press v. N.L.R.B., supra, 492 F.2d at 667 and cases cited at n. 21; Local U. No. 715, Int. Bro. of Electrical Wkrs. v. N.L.R.B., 161 U.S.App.D.C. 217, 494 F.2d 1136, 1137-38 (1974). That does not mean that if an arbitrator finds an unfair labor practice to have been committed, the Board may not impose further remedies available to it under the Act. The Board can and should fashion its own remedies, notwithstanding an arbitration award, in cases where it determines, in its discretion, that such remedies are appropriate in order to carry out its statutory mandate to correct unfair labor practices. Nothing advanced by the Unions in this case convinces us that the Board has abused its discretion to defer to the arbitrators' awards under the circumstances involved here.
 
 
 29
 Consequently, the petitions for review of the Board's orders will be denied.
 
 
 
 *
 United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 The Board's order in No. 74-1035 is reported at 204 NLRB 879 (1972). In No. 74-2211 its order is reported at 213 NLRB No. 22
 
 
 [2]
 Petitioners' brief in No. 74-1035, pp. 60-63
 
 
 [3]
 Section 8(a)(1) (29 U.S.C. § 158(a)(1)) provides:
 (a) It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 
 
 [4]
 Section 8(a)(3) (29 U.S.C. § 158(a)(3)) provides in pertinent part:
 (a) It shall be an unfair labor practice for an employer (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization;
 
 
 [5]
 Section 8(a)(5) (29 U.S.C. § 158(a)(5)) provides:
 (a) It shall be an unfair labor practice for an employer (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 
 
 [6]
 An arbitrator had previously determined that employee Sullivan's three-day suspension had not been for "good cause" under the collective bargaining agreement and had awarded him backpay. The Company had already complied with the arbitrator's award. The administrative law judge consequently found it unnecessary to decide whether Sullivan had been suspended for his union activity. The arbitration in this instance was the result of a district court order compelling the Union to submit the matter to arbitration. United Aircraft Corp. v. Lodge 743, IAM, 77 LRRM 3136 (D.Conn., 1971)
 
 
 [7]
 In a similar case, employee Urbanowicz had been suspended for refusing to sign an attendance book in the absence of a shop steward. As in the case of employee Sullivan's suspension, see supra, footnote 6, the administrative law judge found it unnecessary to determine whether employee Urbanowicz's suspension was a violation of the Act because an arbitrator had already held that her suspension had resulted from the failure to provide a shop steward, a collective bargaining violation. Again, in this instance, the Company had honored the arbitrator's backpay award
 
 
 [8]
 Article VII, Sec. 1, Steps 1-4 of the collective bargaining agreements between the Company and each of the petitioners in No. 74-1035 contained a comprehensive four-step grievance procedure. Section 3(a) of that Article provided for arbitration, at the request of either party, of 39 listed types of grievances if those grievances were not settled at step four of that procedure. Section 3(b) provided for arbitration of all other grievances under the contract upon the agreement of the Union and the Company. The arbitrator's decision was to be "final and conclusive and binding." Article VII, Sec. 3(d)
 The grievance and arbitration provisions of the agreement between the Company and the petitioners in No. 74-2211 are substantially similar to those in force during the period involved in No. 74-1035.
 
 
 [9]
 Shortly thereafter, the Company notified the Union that it was prepared to reconvene Roberge's merit rating grievance in accord with the arbitrator's decision
 
 
 [10]
 As a result of the 1960 strike the Company recovered a large damage award in the Connecticut courts. United Aircraft Corporation v. International Assn. of Machinists, 161 Conn. 79, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972). After a remand of the initial damage award by the Connecticut Supreme Court, the issue of damages was retried and a.$1.4 million judgment against the Unions was affirmed. United Aircraft Corporation v. International Association of Machinists, et al., Conn., --- A.2d --- (1975)
 
 
 [11]
 We note in passing that the violations found in these two cases involve activities on the part of the Company strikingly similar to the activities alleged in the instant cases
 
 
 [12]
 In an exhaustive opinion recently rendered by Judge Moore, this Court enforced the Board's order with respect to violations of the Act by a few members of the Company's supervisory staff in Lodges 743 and 1746, International Association of Machinists and Aerospace Workers, AFL-CIO v. United Aircraft Corporation, --- F.2d --- (2 Cir., 1975). The Court remanded that part of the case dealing with certain aspects of the reinstatement of participants in the 1960 strike and with which party should bear the costs of deleting certain information on documents provided to the Union. It can be fairly said, however, that the Court found no wide-ranging scheme to discriminate against strikers as was alleged by the Unions
 It should also be noted that the Court expressly withheld any opinion with respect to whether or not the Board could or should have declined to assert its jurisdiction where many of the issues involved in that case were the subject of a Section 301 action brought contemporaneously in the district court. Id. at ---. The Court's opinion also affirmed in most major respects the district court's handling of the Section 301 action.
 
 
 [13]
 In addition to all of this, the Company has invoked the jurisdiction of the district court on several occasions in order to compel the Unions to arbitrate disputes which were concurrently the subject of unfair labor practice charges. United Aircraft Corp. v. Canel Lodge No. 700, I. A. of M. & A. W., 314 F.Supp. 371 (D.Conn., 1970), aff'd., 436 F.2d 1 (2 Cir.), cert. denied, 402 U.S. 908, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); see supra, footnote 6, United Aircraft Corp. v. Lodge 743, IAM, 77 LRRM 3136 (D.Conn., 1971)
 
 
 [14]
 See supra, p. 243, United Aircraft Corporation v. N.L.R.B., supra, 440 F.2d at 99
 
 
 [15]
 Carey and International Harvester Co. involved post-arbitration Board deferral, but, as is clear from our Nabisco holding, the Board's pre-arbitration authority to defer is discretionary as well. See also Associated Press v. N.L.R.B., 160 U.S.App.D.C. 396, 492 F.2d 662, 666 (1974); Provision House Workers Union Local 274 v. N.L.R.B., 493 F.2d 1249 (9 Cir., 1974), cert. denied, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52
 
 
 [16]
 The Supreme Court's recognition of this Congressional policy in Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) and in the famous Steelworkers Trilogy, Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1409 (1960); Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and Steelworkers v. Enterprise Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), has been reaffirmed in that Court as recently as Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). Cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 46-47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); William E. Arnold Co. v. Carpenters, supra, 417 U.S. at 16-18, 94 S.Ct. 2069
 
 
 [17]
 The five criteria are:
 "1. the history and quality of the parties' collective bargaining relationship;
 
 
 [2]
 the absence of anti-union animus;
 
 
 [3]
 willingness of the respondent party to arbitrate;
 
 
 [4]
 the scope of the arbitration clause;
 
 
 [5]
 suitability of the dispute to resolution by arbitration."
 Local Union No. 2188, supra, 494 F.2d at 1090.
 
 
 [18]
 We note, as did the Board, that the Company employs more than 40,000 employees in the State of Connecticut. Of the approximately 1,645 supervisors and numerous security employees employed at the Company's plants involved here, only a handful of them have been accused of anti-union harassment in these cases
 
 
 [19]
 We note that certain of the complaints' charges alleged that the Company violated § 8(a)(5) and (1), a refusal to bargain collectively, by refusing to supply information relevant to the effective processing of grievances. Such refusals could, of course, destroy the whole collective bargaining scheme and the very arbitration process to which the Board has deferred. Cf. NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). But even these allegations of Company misbehavior have been resolved by arbitration in at least one instance and the Company has expressed its willingness to proceed in a manner consistent with the arbitrator's award. See supra, p. 242, n. 9
 
 
 [20]
 Arbitrators had found contractual violations by the Company and had made awards in incidents involving employees Sullivan and Urbanowicz in No. 74-1035 and employee Roberge in No. 74-2211. Supra, p. 240, n. 6; p. 241, n. 7; and p. 242